JAMES LONGWORTH v. WILLIAM K. KAVANAUGH, Appellant.

In Banc, March 5, 1921.

1. **VERDICT: Evidence.** The evidence is examined and held to support a verdict for plaintiff upon the oral contract alleged in his petition.

2. ———: **Amount.** The evidence is examined and held to support a verdict for plaintiff for the amount found by the jury.

3. **CONTRACT: Promoters: Public Policy.** Defendant and his associates desired to secure from the County Court of St. Louis County a franchise to build, maintain and operate a railway through the county and across its highways. For this purpose defendant agreed with plaintiff that he should have a certain interest in whatever rights, property or interests defendant and his associates should thereafter acquire, plaintiff to assist in securing such franchise. Certain other individuals also desired to secure such a franchise and filed application therefor with the county court. Thereafter it was agreed between the two sets of parties seeking such franchise that they should unite and form a corporation to obtain the franchise, and of this agreement the members of the county court were fully informed. By this time there were four applicants for the franchise, which finally was granted to the above corporation, the plaintiff in the discharge of his duties to defendant and pursuant to his agreement attending the meetings of the county court during several months and keeping defendant informed of the proceedings thereof. *Held,* the contract was not void as being contrary to public policy.

4. ———: ———: **Action at Law.** Plaintiff and defendant agreed that plaintiff should assist defendant and his associates to procure a franchise from the county court to build, maintain and operate a railway through the county and across its highways, and for his services plaintiff should receive one-sixteenth of

286 Mo.—35

whatever financial gain might come of the enterprise. The franchise was finally granted to a corporation, and defendant and his associates secured the control of the capital stock of such corporation. Thereafter defendant and his associates organized another corporation, to which said franchise was transferred, and defendant and his associates received 800 shares of the latter's preferred stock, which was afterward transferred for $160,000 to another corporation, and in addition thereto such last corporation paid defendant $50,000 for his services in securing such franchise and also paid all the debts and liabilities of the corporations whose stock was transferred to it. *Held*, that plaintiff could maintain an action at law to recover his one-sixteenth interest in such total proceeds amounting to $210,000.

5. **INSTRUCTIONS: Correct Theory.** Instructions which predicate plaintiff's right to recover upon correct principles as applied to the facts shown by the evidence and hypothesized in the instructions are not erroneous.

6. **VERDICT: Amendment of: Timely Objection.** Objections to the trial court's action in having the verdict of the jury as returned into court amended by the jury, or its foreman in its presence, must be made at the time of such action, and come too late if first made in the motion for a new trial.

Appeal from St. Louis City Circuit Court.—*Hon. William T. Jones,* Judge.

AFFIRMED.

*A. & J. F. Lee* and *James A. Waechter* for appellant.

(1) The court erred in refusing to give defendant's instruction for nonsuit offered at the close of plaintiff's case, and the instruction offered at the close of the entire case, because the testimony, so far as it tended to establish any contract, tended: (a) To establish a contract that was void and unenforceable in law, a purely lobbying contract, against public policy and sound morals. Porter v. Jones, 52 Mo. 399; Nash v. Kerr-Murray Mfg. Co., 19 Mo. App. 1; Ridenbaugh v. Young, 145 Mo. 280; Tool Company v. Norris, 69 U. S. 45; Marshall v. Railroad Co., 16 Howard, 314; Gill v. Withorne &

Davis, 12 La. Ann. 219; Harris v. Roof's Exr., 10 Bart. 489; Pease v. Walsh, 49 Abb. Pr. 269; Critchfield v. Asphalt Co., 174 Ill 466; Harris v. Simonson, 28 Hun, 318; Hovey v. Storer, 63 Me. 486; Oscanyan v. Winchester Co., 103 U. S. 261; Newman v. Davenport, 9 Baxt. 538. (b) The alleged contract was void as suppressing competition. Hyer v. Traction Co., 80 Fed. 839; Engleman v. Skrainka, 14 Mo. App. 438; Durfee v. Moran, 57 Mo. 379; Wooten v. Hinkle, 20 Mo. 290; Hook v. Turner, 22 Mo. 333; Lawnon v. Bradley, 13 Mo. App. 361; In re Salmon, 145 Fed. 649; Finch v. Granite Co., 187 Mo. 244. (2) The court erred in giving to the jury plaintiff's Instruction No. 1, because as applied to the testimony and evidence in this case, it was erroneous, misleading and confusing. (2) Plaintiff's Instruction No 2 is erroneous. (3) The court erred in directing or in permitting the foreman of the jury to change the verdict as rendered by the jury when first handed into court, and, thereafter, when a second time handed into court; so that the verdict accepted by the court is the verdict of the court or of the court and the foreman of the jury, and not the verdict of the jury.

*Robert E. Collins* and *Edward D'Arcy* for respondent.

(1) The trial court committed no error in overruling defendant's instruction for a nonsuit offered at the close of plaintiff's case and the instruction offered at the close of the entire case. While there was evidence offered by both sides, the jury having found in favor of the plaintiff, particularly on the second trail of the case, and the trial court having overruled the defendant's motion for a new trial, the sufficiency of the evidence will not be considered by this court. (2) The contract between the plaintiff and the defendant was not a lobbying contract or against public policy or sound morals. Hyer v. Traction Co., 168 U. S. 82; 9 Cyc. 492, note 82; Smith

v. Greenlee, 2 Dev. (N. C.) 126; Piatt v. Oliver, 44 U. S. 411; Kelerher v. Henderson, 203 Mo. 498. (3) The defense that the contract sued on is against public policy is a special defense which must be pleaded and cannot be shown under a general denial. Musser v. Adler, 86 Mo. 445; Moore v. Ringo, 82 Mo. 473; Kelerher v. Henderson, 203 Mo. 498. (4) The appellant is estopped to assert the invalidity of an agreement between himself and the syndicate interested in the St. Louis Belt & Terminal Railway Company to combine their efforts to procure a franchise. Vette v. Geist, 155 Mo. 27; Kelerher v. Henderson, 203 Mo. 498. (5) The verdict as filed was the verdict of the jury.

BROWN, C.—This suit was instituted in the Circuit Court for the City of St. Louis on March 15, 1905, and has been once before in this court (190 S. W. 315). It was tried to a jury in said circuit court at the April term, 1907, resulting in a verdict for the plaintiff in the sum of eleven thousand two hundred ninety-three dollars and thirty-three cents, which was set aside on motion on the ground that it was against the weight of the evidence. An amended petition was afterward filed and stricken out for variance. Plaintiff declined to plead further and appealed to this court from the final judgment rendered against him, which we reversed, and remanded the cause. Another trial was begun on March 12, 1917, resulting in a verdict and judgment for plaintiff in the sum of $11,671.91, from which this appeal is prosecuted. After the verdict and before final judgment, the plaintiff, by leave of court filed his fifth amended petition as provided in Section 1849, Revised Statutes 1909.

This petition omitting introduction and formal conclusion is of the following tenor:

"That during the month of May, 1899, the plaintiff and defendant, William K. Kavanaugh and John B. Clayton, L. R. Wilfley, W. M. Mitchell, James Y. Lockwood and other persons whose names are unknown to

plaintiff, said unknown persons being represented by the defendant and cannot therefore be stated, associated themselves together, for the purpose of building, constructing, maintaining and operating a single or double track railway in and through the County of St. Louis in the State of Missouri, and for the purposes of such railway of obtaining from the County of St. Louis in said State, a grant, franchise or right to build, construct, maintain and operate such railway; that it was orally agreed by and between the plantiff and the defendant William K. Kavanaugh that the plaintiff should own and have a one-sixteenth interest or part in whatever rights, property or interests said association should thereafter acquire.

"That it was thereafter determined and agreed between defendant and his said associates that instead of endeavoring to secure a franchise from the County of St. Louis to themselves directly, said enterprise should be carried out by assisting another corporation known as the Central Belt Railway Company, a corporation organized under the laws of the State of Missouri and by its charter authorized to build, construct, maintain and operate a single or double track railway in and through the County of St. Louis and State of Missouri, to secure said franchise, and by making an arrangement with the parties interested in said company for securing to defendant and his associates the control of said Central Belt Railway Company and said franchise and rights.

"That plaintiff, defendant and their associates did work together with the parties interested in said Central Belt Railway Company, to secure said franchise in the name of said Central Belt Railway Company, and the fact that said two interests were working together was well known and understood by said County Court of St. Louis County, and said County Court desired said co-operation between said two interests, in order that there might be sufficient financial backing behind said

Central Belt Railway Company, to justify the granting of a franchise to it.

"That on, to-wit, October 4, 1899, said County Court of St. Louis County granted said franchise to the said Central Belt Railway Company for a belt line railway as above set out.

"That as a result of the plan above set out, the stockholders of said Central Belt Railway Company did on or about October 18, 1899, enter into a contract with defendant, in which it was agreed that the stock of said Central Belt Railway Company should be transferred to defendant, that defendant should reorganize and finance the enterprise of constructing said belt railroad, and that defendant and his associates should own thirteen-sixteenths of said reorganized company, and said Central Belt stockholders should own three-sixteenths thereof.

"That pursuant to said contract, the stock of said Central Belt Railway Company was, on or about said October 18, 1899, duly transferred and delivered to defendant and his associates, practically the whole thereof being transferred to and issued in the name of William K. Kavanaugh, trustee.

"That on or about March 8, 1900, defendant and those associated with him acquired by purchase from said original stockholders of said Central Belt Railway Company, whatever right, title and interest they still retained in the stock of said company.

"That thereafter and in about the month of March, 1902, defendant and his associates, the then owners of the entire capital stock of the Central Belt Railway Company, caused another corporation to be organized under the laws of the State of Missouri, known as the St. Louis Belt & Terminal Railway Company, which was authorized under its charter to build, construct, maintain and operate a railway in and through the County of St. Louis, Missouri.

"That on or about the 31st day of May, 1902, said association or syndicate, composed of defendant and

his associates, caused said Central Belt Railway Company, without consideration moving to it, to assign, transfer and convey to said St. Louis Belt & Terminal Railway Company the said grant, right and franchise given to it as aforesaid by said St. Louis County, Missouri.

"That during all the above-mentioned times the interest of the plaintiff in the stock of both the Central Belt Railway Company and the St. Louis Belt & Terminal Railway Company were held by defendant in his own name, but for the use and benefit of the plaintiff.

"That from the time the capital stock of said Central Belt Railway Company was, about October 18, 1899, placed in the name of defendant and his associates, as aforesaid, defendant and his associates other than plaintiff were in control of said stock and of the operations of said Company, and were also, from the time of the organization of said St. Louis Belt & Terminal Railway Company, in control of the stock, or a large part thereof, and of the operation of the said St. Louis Belt & Terminal Railway Company.

"That later, to-wit, by a contract dated July 18, 1902, and finally consummated on October 1, 1902, the defendant and those acting with him in control of said corporation, sold all of the stock then issued of the said St. Louis Belt & Terminal Railway Company to the Terminal Railway Association of St. Louis, a corporation, and received in payment therefor, and for promoter's fees, the sum of two hundred and ten thousand dollars, one-sixteenth part of which belonged to and was the property of the plaintiff. That said entire consideration of two hundred and ten thousand dollars was by said Terminal Railway Association of St. Louis paid to and received by the defendant. Said Terminal Railway Association of St. Louis, as part of the purchase price of said stock further assumed and agreed to pay, and did pay, all outstanding debts and liabilities of said St. Louis Belt and Terminal Railway Company.

"That by reason of the premises the defendant became and was indebted to the plaintiff in the sum of

thirteen thousand, one hundred and twenty-five dollars, and on or about the second day of October, 1902, the plaintiff demanded from the defendant the payment of his said share in the proceeds of said sale, amounting as aforesaid to the sum of thirteen thousand, one hundred and twenty-five dollars, but the defendant failed and refused, and still fails and refuses, to pay the same or any part thereof to the plaintiff.''

It concludes with a prayer for judgment. The answer is a general denial. At the close of plaintiff's evidence and again after the evidence was all in the defendant asked that the jury be instructed peremptorily to find for defendant, which was refused and defendant duly excepted.

The court gave the following instructions for plaintiff:

"1. The court instructs the jury that if they believe and find from the evidence in this case that during the month of May, 1899, the defendant, W. K. Kavanaugh, and the plaintiff, together with other persons, associated themselves together for the purpose of building, constructing, maintaining and operating a single or double track railway in and through the County of St. Louis in the State of Missouri, and for the purposes of such railway, of obtaining from the County of St. Louis in the State of Missouri, a grant, franchise or right to build, construct, maintain and operate such railroad; and that it was orally agreed by and between the plaintiff and the defendant, W. K. Kavanaugh, that the plaintiff should own and have a one-sixteenth interest or part in what ever right said association or syndicate should thereafter acquire; and, if you further find and believe from the evidence that it was thereafter determined by defendant and his associates that instead of endeavoring to secure a franchise from the County of St. Louis to themselves directly, said enterprise should be carried out by assisting the Central Belt Railway Company to secure said franchise, and by making an arrangement with the par

ties interested in said company for securing to defendant and his associates the control of said Central Belt Railway Company and said franchise and rights; and if you further find and believe from the evidence that it was known by said county court the said two interests were working together to secure said franchise in the name of said Central Belt Railway Company, and that said county court desired said co-operation in order that there might be sufficient financial backing behind said · Central Belt Railway Company; and if you further find and believe from the evidence that in October, 1899, the County Court of St. Louis County granted said franchise to the said Central Belt Railway Company for a belt line railway as above set out, and that later and in the early part of 1900 the defendant and his associates in said enterprise, did as a result of said plan, secure control of said franchise through securing all or a majority of the stock of said Central Belt Railway Company; and if you believe and find from the evidence that thereafter the defendant and his associates caused said franchise and stock to be transferred to the St. Louis Belt & Terminal Railway Company, and thereafter the St. Louis Belt & Terminal Railway Company transferred all of said right, franchise and stock to the Terminal Railway Company of St. Louis; and if you believe and find from the evidence in this case that the entire capital stock of said Central Belt Railway Company was placed in the name of defendant and his associates, a portion thereof standing in defendant's name as trustee, and that defendant and his associates other than plaintiff were in control of said stock and of the operation of said company, and were also in control of the stock or a large part thereof and of the operations of the St. Louis Belt & Terminal Railway Company;

"And if you believe and find from the evidence in this case that on or about July 18, 1902, the defendant and those acting with him in control of said corporation sold all of the stock then issued of the St. Louis Belt &

Terminal Railway Company, to the Terminal Railway Association of St. Louis, and that defendant received payment for said stock so held by him or for promoter's fees, or both, a sum or sums of money over and above all debts and liabilities of said St. Louis Belt & Terminal Railway Company, and has failed to pay plaintiff any portion of same, then your verdict will be for plaintiff.

"2. If the jury find in favor of the plaintiff, they will return a verdict in his favor for such proportionate part of the sum of money said defendant Kavanaugh received from the sale to the Terminal Railway Association of stock of the St. Louis Belt & Terminal Railway Company, or for promoter's fees, or both, if he received any money from such stock, or promoter's fees, or both, as the jury may find and believe from the evidence in this case, it was agreed, if it was agreed, that the plaintiff's interest should amount to, in the association or syndicate formed for the purpose of acquiring a belt railway franchise, together with interest thereon at the rate of six per cent per annum from the date of demand made by plaintiff on the defendant, if the jury believe from the evidence such demand was made."

To the giving of these instructions defendant also excepted. The jury on the 15th of March, 1917, returned into court its verdict as follows:

"We, the jury in the above cause, find in favor of the plaintiff, on the issues herein joined, and assess his damages at the sum of five thousand dollars, with interest thereon at six per cent per annum from August 1, 1902, amounting to $6671.91, aggregating $11,671.91."

On March 20, 1917, the defendant filed his motion for a new trial, which after specifying as grounds thereof the various matters of exception taken at the trial, contained the following specification of error:

"The verdict filed in this case as the verdict of the jury herein is not the verdict of said jury, because the verdict rendered by the jury in this case was in words and figures as follows:　　　.

" 'In the Circuit Court, City of St. Louis, Division No. 5. James Longworth, Plaintiff v. Wm. K. Kavanaugh, Defendant. No. 36663.

" 'We, the jury in the above cause, find in favor of the plaintiff, on the issues herein joined and assess his damages at the sum of five thousand dollars ($5,000), with interest thereon at six per cent per annum from ............ amounting to ............ dollars, aggregating .............. dollars.

" 'C. L. CLARY, Foreman.'

"And the court erred, after the jury had returned with its said verdict and duly delivered the same as its verdict to the court through its foreman, in calling the foreman up to the judge's desk and saying to said foreman, out of the hearing of the other members of the jury, 'Don't you want to give him' [meaning the plaintiff] 'interest?' and thereupon the foreman said to the judge of this court, out of the hearing of the other eleven members of the jury, 'Yes' and thereupon the court said to said foreman, out of the hearing of said other jurors, 'You had better go back and figure it out,' and delivered said verdict to said foreman. Thereupon said foreman retired with the other members of the jury with said verdict, and shortly thereafter the jury returned into court and the foreman handed to the court the verdict formerly rendered, with the words 'date of original petition,' inserted therein after the words 'six per cent per annum from' and the figures '$6671.91' inserted after the words 'amounting to,' and the figures '$11671.91.' after the word 'aggregating,' said three insertions having been made during the second retirement of the jury; and thereupon the court, upon reading said verdict with such insertions erroneously made therein, as above set forth, further erred by asking the said foreman, out of the hearing of a number of the jurors in said case, the following question, 'From what date did you' [meaning the foreman] 'calculate the interest?' and the

foreman then and there replied to the court, out of the hearing of some of the jurors, as follows, 'I think August 1, 1902;' and the court further erred in thereupon instructing the foreman, out of the hearing of some of the jurors, to strike out the words then erroneously inserted in said verdict reading as follows, 'date of original petition,' and insert instead thereof the words, 'Aug. 1, 1902,' and thereupon the said foreman, without further consultation with any member of the jury struck out said words 'date of original petition,' and inserted instead thereof the words 'Aug. 1, 1902,' and delivered to the court the said verdict as so twice amended, and the court received and ordered the same to be filed as the verdict of the jury, all of which was over the objection and exception of said defendant.

"That the sum of $6,671.91 is more than six per cent per annum on $5,000 from either the date of the original petition on August 1, 1902, and is further erroneous for that reason."

On March 22, 1917, the plaintiff entered a *remittitur* of $2,285.25, and judgment was re-entered for $9,285.66, to which defendant excepted.

At the following term and on June 25, 1917, the court overruled the motion for a new trial, to which the defendant duly excepted. This appeal was duly allowed at that term.

The evidence tended to show that the defendant was president of The Interstate Car Transfer Company, having facilities on both banks for the transfer of railway cars by boat across the Mississippi River at St. Louis, in competition with the Terminal Association. He contemplated and desired the construction of a belt railway that would connect him with all railroads entering St. Louis. It would be necessary to cross public highways of the county for which the permission of the county court was required by law. This permission could, of course, be granted only to or held by a corporation authorized by law to construct and operate such a railroad.

The members of the county court were greatly interested. They believed that the line would be of great benefit to St. Louis County by inducing the location of manufacturing and other shipping interests upon it, and they desired that it should not come into the hands of the Terminal Association, nor of any interest which might hold it for purposes of speculation or to suppress competition with existing facilities. They required therefore that applicants should demonstrate to them their financial ability, or "backing" as it is called in the record, to do the work and operate the property, as well as their purpose to prosecute the enterprise.

Under these circumstances the defendant consulted with plaintiff and one Clayton as to the prospects of such an enterprise and the best method of procedure. Defendant met some parties, including Clayton and Sneed at the Planters Hotel at St. Louis, and discussed with them the matter of procuring a franchise for the necessary street crossings in St. Louis County. Sneed then left, and joined himself with Essen, the recorder of St. Louis County, who is described as "a power," and Lingenbrinck, a son-in-law of one of the county judges, forming what is called in the record the Welch crowd, because Welch, Jones and Wagoner represented them respectively on the face of the proceedings. On May 22 the three individuals nominally constituting the Welch crowd filed their petition with the County Court of St. Louis County for the necessary franchise, evidently ignorant of the fact that as individuals they had no authority to hold or use it.

This move was immediately communicated in some way to defendant's financial associates in New York, who wired to know if it was his application, and he immediately had a consultation with Clayton and plaintiff in his office as to the best means of dealing with the Welch crowd. At this time the interests of the prospective parties to the deal were talked over, and it was agreed and understood that the venture was to be divided into

eight parts of which the plaintiff and Clayton, who were working together, should represent one. They also considered the matter of combining with the Welch crowd and concluded to seek the assistance of Essen. Clayton brought about an interview between defendant and Essen at which he was present and at which Essen told the defendant, in substance, that he thought the Welch crowd would get the franchise and suggested a combination with them without disclosing that he was himself one of them. An interview was also arranged by plaintiff and Clayton between defendant and the members of the county court, who went to defendant's office to talk over the matter, and met him afterward from time to time and the plan was agreed upon for the combination of the two interests in a corporation, called the Central Belt Railway Company, incorporated July 27, 1899, with a capital stock of $200,000.00 with Welch and others as incorporators. The negotiations were united on this line. By this time there were four applicants for the franchise, and one of the duties of plaintiff in his connection with defendant in the matter was to observe and report the proceedings of the county court which met during the five or six months these matters were pending, on Tuesday of each week, and to report to defendant. The franchise was granted to the Central Belt on October 4, 1899 and duly accepted during the next following month.

Immediately upon the granting of the franchise the defendant took charge of the enterprise. He states that he had "succeeded in enlisting the services of all of our natural allies in the enterprise in a thorough and enthusiastic manner," and had secured a banking house to take the lead in financing the construction. The breaking out of the Boer war, however, interfered with this branch of the undertaking and it rested *in limine* until March 14, 1902, when the St. Louis Belt & Terminal Railway Company was incorporated for the purpose of owning and constructing the same road, the defendant

being named as one of the first board of directors.  Its capital stock was $3,000,000, $800,000 of which was to be preferred.  On the 31st day of May, 1902, the Central Belt Railway Company transferred to the St. Louis Belt & Terminal Company all the rights it possessed by virtue of the several orders of the county court granting its franchise, subject to all the obligations, conditions and responsibilities imposed by said orders on said Central Belt Railway Company and its successors and assigns.  On July 18th of the same year Kavanaugh and his associates, acting through Kavanaugh alone, reciting that they were owners of all the capital stock in the Interstate Car Transfer Company and all the capital stock and subscriptions to capital stock of the St. Louis Belt & Terminal Company, made an agreement by which he, acting for himself and his associates, sold to the Trust Company all the capital stock of the Interstate Car Transfer Company and all the stock and subscriptions to stock of the St. Louis Belt & Terminal Company, at the price of $135 per share for the 5,000 shares of the Car Transfer Company, amounting to $675,000, and the 8,000 shares of preferred stock of the St. Louis Belt & Terminal Company at $20 per share, amounting to $160,000, being a total consideration of $835,000.  This instrument was signed by W. K. Kavanaugh for himself and associates as parties of the first part and the Mississipi Valley Trust Company, agent, by Julius S. Walsh, president, party of the second part.  Attached to this agreement was a statement signed by Julius S. Walsh, president, as follows:

"In execution of the attached agreement the Mississippi Valley Trust Company is acting as agent for the Missouri Pacific, St. Louis Iron Mountain & Southern, Wabash, Louisville & Nashville, Cleveland, Cincinnati, Chicago & St. Louis, St. Louis, Vandalia & Terre Haute, Baltimore & Ohio Southwestern and the St. Louis & San Francisco Railway Companies."

The Terminal Association, as the beneficiary of this contract, became the owner of the stock of the St. Louis

Belt & Terminal, and paid all amounts due defendant and his associates, on contract, as well as the obligations of the St. Louis Company. It paid Kavanaugh the one hundred and sixty thousand dollars due for the stock, and as a liability of that company which it assumed, paid him an additional fifty thousand dollars for services in securing the franchise.

The evidence is indefinite as to what he paid out. To some of his associates in the Central Belt deal he paid ten thousand dollars, settled with others through Mr. L. R. Wilfley, his associate and attorney, for less, and one of them, Mr. Essen, who testified, thinks he got more, having received a payment subsequent to the first ten thousand dollars. In answer to plaintiff's demand he said, in substance, that there was nothing coming to him.

So far as may be necessary the details of the evidence will receive further notice as we proceed with the opinion.

I. This cause has been once before in this court. It had been tried upon a petition declaring on the same contract now before us, and the verdict of the jury was for plaintiff. It was set aside on the grounds, (1) that it was against the weight of the evidence; (2) that it was contrary to the court's instructions, and (3) that it was excessive. The plaintiff then filed an amended petition, setting up the same contract, with further particulars as to the alleged breach. [Longworth v. Kavanaugh, 190 S. W. 315.] This is the petition upon which the issues were submitted at the last trial, and the verdict of the jury is a second verdict thereon, and the question is now before us whether or not the finding is supported by any substantial evidence in this record.

The entire evidence, including the testimony of defendant, shows that he was highly sophisticated with respect to such matters as the franchise which is the substance of this inquiry. He desired to obtain it for

his own benefit to be derived indirectly through the corporation of which he was the head as well as directly through his own individual services. It was also thought to be of importance in the development of the industries of St. Louis County, represented by its county court. Both plaintiff and Clayton were acquainted with the conditions and influences prevailing in the county and the interest which should obtain it would occupy a commanding position with reference not only to traffic having its origin or destination in the City of St. Louis, but also in interstate traffic crossing the Mississippi at that point, subject to an arbitrary burden for the transfer. Every railroad entering the city and engaged in interstate business was interested in an arrangement by which the profits of this part of the transit should not be permitted to get away from them. This is conclusively demonstrated in the evidence by the entrance into the transaction of the Mississippi Valley Trust Company as agent for them.

It is natural that, under these circumstances, persons wise in such matters should desire to become interested in the construction of a road by which this immense traffic could be collected and distributed, and incidentally to obtain from the County Court of St. Louis County the permission to cross the highways of the county without which it could not be built. It is also natural that the defendant Kavanaugh should be interested through his Car Transfer Company, the special interest of which appears in the result, which we will notice in due time, and we will also notice the quality, so necessary in matters of that kind, of concealing from his right hand what his left hand might do; and he put both hands at work immediately. Essen, whom· he describes as "a power," with Lingenbrinck, a son-in-law of one of the county judges, and Sneed, superintendent of the Suburban Railroad, got into the field before then and under cover of Welch, Jones and Wagoner, whom they placed in front of their own bodies for the inspection

286 Mo.—36

of the public, filed their application for this coveted franchise. Defendant saw the necessity for gathering to his own assistance some local, that is county, assistance, to watch the proceedings of the county court and put him in contact with such persons as might be of assistance. It was under the circumstances and measureably for these purposes that he sought plaintiff and Clayton for assistance. Each of the two relates in his testimony that he employed them to assist in obtaining the franchise, promising each of them one-sixteenth of whatever financial gain might come of the enterprise, which he said, in substance, would be divided into eight parts, one of which should go to them, each receiving one-sixteenth of the whole. There is much other evidence, including that of defendant himself, which tends to corroborate their statement. He says, in effect, that something took place between him and them which led him to think they might afterward claim some compensation from him, and that he fortified himself by making a memorandum of a meeting he afterward held with them when he had discovered that others were in the field before him, to the effect that nothing was coming to them. He also, in making distribution of what he claims to be the proceeds of the final sale, recognized this theory of eighths and sixteenths. We have little doubt, from the evidence, that when plaintiff and Clayton began their work by bringing him into contact with Essen and the members of the county court, such an arrangement existed between them. Defendant says that whatever arrangement there was terminated by the failure to obtain the franchise as against the "Welch crowd." Notwithstanding this plaintiff kept on with his activities. He testified that in addition to his connection with bringing about interviews between Essen and all the judges of the county court and defendant, he attended, during the five months the matter was pending before that body, every meeting which it held, under instructions from defendant to keep his

mouth shut and to report whatever was done in that connection. The court met each Tuesday. One of the judges testified to his presence and activities. That the arrangement was made and that the services continued up to the time of the granting of the franchise to the Central Belt Railway Company on October 4, 1899, there can be no doubt. It stands practically admitted in the record. If we may be permitted to use the figure, plaintiff and Clayton were the fingers of the left hand while his right was at work with the material they gathered, as well as any other matters useful to the enterprise. During this time Mr. L. R. Wilfley became associated with the enterprise as defendant's attorney, gathering in some of the claims of the original promoters, including Lingenbrinck and Sneed, at what they would take for their interest, and receiving $10,000 for himself as an attorney's fee.

The foregoing are a few features of the evidence that has convinced us that the jury had sufficient evidence before it from which to find that the testimony of plaintiff and Clayton that the former because connected with the enterprise under an agreement with the defendant that he would share in its proceeds to the extent of an interest of one-sixteenth part of the whole, and that he performed such services as were required of him in accordance with its terms, is true. His connection and services covered the period from the time he came into it for the purpose of assisting defendant about May 19, 1899, until the final order of the county court by which the franchise was granted to the Central Belt Company. When that was done the rights of the parties were fixed and it only remained to liquidate the property interest so acquired.

II.   Clayton testified that at the time this agreement was made between plaintiff, himself and defendant,

**Evidence Supports Amount of Verdict.** the defendant explained that there was being organized a corporation for three million dollars and that sixty-five per cent of this stock would go to the bondholders and that there would be thirty-five per cent for the promoters,

of which he and Lockwood, the secretary of the Inter-state Company, would have one-eighth between them, and the witness and plaintiff one-eight. No such company was incorporated until March 14, 1902, when the St. Louis Belt & Terminal Company with capital stock to that amount, $800,000 of which was preferred, was incorporated in this State for the purpose of constructing and owning the same line. On May 31, 1902, the Central Belt Company conveyed to it "all the rights, privileges, and authority heretofore granted to it, and its successors and assigns, by the County Court of St. Louis County, to build, maintain, and operate a railroad in said county," subject to all its obligations with reference thereto. No consideration was expressed or paid for the transfer, so that every interest in this franchise, including whatever might be realized from it, passed to the new company of which defendant was president. It was simply a step toward the realization of something out of the Central Belt Company in which he held all the interest of plaintiff for the further purpose of converting it into tangible property for final distribution to the equitable owners. It made no change in the situation of the enterprise other than to substitute for the old a new agency for the purpose of turning it into money. Had it proceeded to issue its bonds and construct its line, issuing sixty-five per cent of each kind of its capital stock as a bonus therefore, the old promoters would have been entitled to the remaining $1,050,-000. It is unnecessary, however, to speculate as to how much they would have received in distribution under that plan had it been carried out, for it was not carried out. On July 18, 1902, the defendant purporting to act for himself and his associates transferred the entire three millions of capital stock of the St. Louis Company to the Mississippi Valley Trust Company as agent for eight railroad companies entering St. Louis, as well as the entire capital stock of his own Car Transfer Company, amounting to $500,000, receiving therefor, in cash

the sum of $675,000 for the capital stock of his own company and $160,000 or $20 per share for the preferred stock of the St. Louis Belt, which latter sum represented the profits of himself and his associates, including the plaintiff, in the Central Belt Company, unless that profit was enhanced as follows:

The stock was purchased on account of the St. Louis Terminal Association which became the owner in the transaction, and the indebtedness of the two corporations was paid through that association. The defendant charged the St. Louis Company for the services in procuring the franchise of himself and his associates $50,000, which was also paid by check of the Terminal Association, which was duly cashed by him.

Recapitulating: The evidence shows conclusively that the word "associates" as used by defendant in these transactions meant those associated with him in procuring the Central Belt franchise, including the plaintiff; that he held the franchise in trust for himself and associates; that all his interest in the Central Belt, whether represented by stock or otherwise, was subject to that trust; that the transfer to the St. Louis Belt & Terminal carried nothing but the franchise which constituted the entire property of the St. Louis Terminal of which Kavanaugh for the use of himself and associates in the Central Belt Company was the only stockholder, and that his subsequent transfer of this stock to the Mississippi Trust Company carried nothing of value except the interest of himself and associates in the Central Belt franchise, while the payment of $50,000 for services in procuring the franchise inured to himself and the same associates. All money expended by the St. Louis Belt Company in exploration or construction or otherwise, was paid by the Terminal Association, in addition to the $210,000 paid Kavanaugh for the entire stock and services, so that the latter sum represented the profits made for himself and associates only. The $50,000 paid to Kavanaugh and included in this amount

was not for any services rendered the St. Louis Company, but for services rendered to the Central Company for obtaining the franchise, and constituted a payment by the Terminal Association for the Centrial franchise, in addition to the amount of $160,000 paid for the preferred stock which represented it in the transfer to the Trust Company.

The transfer by Kavanaugh and his associates of the Central Company's franchise to himself and the same associates as sole stockholders of the St. Louis Belt did not discharge it from the trust subject to which he held it in the former capacity.

The jury having found that the plaintiff was associated with the defendant under the arrangement pleaded, it was their duty to find the amount received by the defendant for the use of the plaintiff under that arrangement. It is only necessary to say in that connection that the verdict is well within the amount shown by the evidence.

III. The petition states, in substance, that in May, 1899, the defendant and plaintiff with Clayton, Wilfley and others associated themselves together for the purpose of constructing, maintaining and operating a railway through the County of St. Louis, and for that purpose to obtain from the county a grant or franchise from the county court to build and operate the same across the highways of the county and orally agreed that the interest of the associates should be apportioned so that plaintiff should have an interest amounting to one-sixteenth in the enterprise and that for that purpose they joined themselves with others who desired to do the same thing, and who organized a railroad corporation under the name of the Central Belt Railway Company, with powers necessary for that purpose, the stock of which, or practically the whole of it, was issued or transferred to defendant in trust for carrying out the purposes of its organization.

*Contract: Public Policy.*

The defendant contends that the contract so pleaded is against public policy because it implies, or necessarily involves, the use of improper and unlawful methods to influence the county court in the performance of a public duty for which compensation is not recoverable by suit. We do not understand the argument to be that the arrangement as stated in the petition is void on that ground, but rather that the contract proven is against public policy and is therefore inadmissible to prove a cause of action. We will, therefore, proceed to examine the contract shown in plaintiff's evidence, assuming that improper acts done and intentions entertained by defendant not required by the terms of the contract ought not to defeat a recovery.

That the contract proven contemplates the performance of services by the plaintiff in procuring a franchise for the benefit of defendant and his associates authorizing the construction of a railroad across certain highways of the county is evident. This necessarily involved association with others in the prosecution of the enterprise, including obtaining the consent of the county court for that purpose. It also involved the creation of a corporation consisting of not less than five persons for that purpose. Until that number should associate themselves together there could be no instrumentality to receive the permission. One of the questions then before the defendant was the personality, usefulness and number of the incorporators. There was no maximum limit fixed by law as to the number. Nor were qualifications fixed by law.

It is plain the contemplated Belt line could only be built in St. Louis County with the permission of the county court. As the work contemplated was a single road which must be definitely located before the permission could be granted, it must go to a single corporation, and the court must make the selection. Its power in this respect was not in any sense judicial. [Aldridge v. Spears, 101 Mo. 400.] That railways are public highways, and that their privileges and duties constitute a

public use has long been judicially settled. The public is interested in their establishment, and the Legislature has made the county courts of the respective counties its administrative agent to determine whether the public interest requires such interference with the use of the highways and to prescribe rules by which the public may be protected in such use.

The evidence definitely presents the questions which interested the county court in this case. (1) They desired to protect the highways from unnecessary interference and the public from danger arising from the proposed use; (2) to promote the industrial prosperity of their county by new and useful shipping facilities; (3) to create healthy competition in the terminal handling of freight and passengers, and (4) to provide an instrument of such competition which would be unlikely to strengthen what they believed to be an existing monopoly by merger with it. In plainer words they state, in substance, they did not want it to fall into the hands of the St. Louis Terminal Association.

There is every evidence in this record that the county court was actuated in everything it did by a desire to serve the public in a matter which they believed to be of the greatest public importance, and that they did everything they could to acquire information to assist them in the accomplishment of that object. The law prescribes no method which shall govern them in this respect. It was open to them to faithfully perform their duty by such means as should be presented by circumstances and they were at liberty to acquire information from all sources and to use it for the protection of the public. They had a duty to perform beyond remaining supinely in the court house waiting for some one to appear and publicly argue their respective claims. It was their duty as it is the duty of legislators to acquaint themselves with the needs of the public and the best way to supply those needs.

In this case others were in the field before the defendant and his associates. Instead of openly approach-

ing the court in their own interest they approached it through straw men, who appear in the record as the "Welch crowd," and still others came forward to procure the same permission. The court was well aware that the "Welch crowd" had organized itself into a corporation having legal authority to take, hold and use the franchise. Through plaintiff and Clayton, defendant got into communication with Essen and all the members of the county court, the latter appearing especially solicitous as to his transfer company, and his ability to provide for financing the enterprise, and finally, the two crowds coming together, the franchise was granted to the Central Belt and Terminal Company.

We do not think that defendant's counsel intend to say that a person desiring to organize a corporation of this kind must, to avoid the ban of unlawful combination, exclude from the enterprise all persons similarly inclined, yet it is not easy to interpret his argument otherwise. The primary interest of the county in this case was the development of its industrial resources. It had nothing for sale but much to promote the prosperity of all its people and it was the duty of their agent, the court, to encourage and consolidate the elements which might contribute to this result.

We have considered this question with particular reference to the provisions of the Missouri statute relating to the relations and the duties, in that connection, of the county courts, and from that standpoint we can see nothing in the combination of individuals formed for the purpose of prosecuting this enterprise, inconsistent with the public good. In the light of this legislation the case is probably unique, but the same general principles were thoroughly discussed in the Supreme Court of the United States in an opinion by Mr. Justice BREWER in Hyer v. Richmond Traction Co., 168 U. S. 471. The court at page 476, said:

"The case thus presented is: Two parties apply separately to a city council for a franchise to construct

a street railway. The banker from whom each of the parties is seeking financial assistance advises them to unite and make a single application. They do so, and thereafter the city council, aware of both interests, of the two applications, of the advice to consolidate, and the party by whom it is given, and of all the terms of the consolidation, grants the franchise to only one of the parties. Was the agreement to unite in one application against public policy and void?

"In the view we have taken of the second of these questions it is unnecessary to definitely determine the answer which should be given to the first, though it may not be inappropriate to observe that the vice which is so frequently detected in contracts and agreements of a similar nature lies in the fact of secrecy, concealment and deception; the one applicant, though apparently antagonizing the other, is really supporting the latter's application, and the public authorities are misled by statements and representations coming from a supposed adverse but in fact friendly source. It would scarcely be doubted that two or more parties may properly unite in a partnership or corporation and thus unitedly make, in the name of the partnership or corporation, a single application for a grant or franchise; and, if they may so unite before any application, it is not easy to see why they may not so unite after having once made separate applications, providing all the facts and circumstances are fully disclosed and the public and the public authorities act upon full knowledge; and if they may sometimes so unite, an agreement for uniting is not necessarily void."

That case had been tried in the Circuit Court of the United States for the Eastern District of Virginia which held, upon demurrer to a bill in equity to enforce the contract mentioned in the foregoing opinion, that the remedy of complainant was at law and not in equity, and accordingly sustained the demurrer. Upon appeal to the Circuit Court of Appeals for the Fourth

Circuit the judgment was affirmed by a divided court in an opinion of SIMONTON, Circuit Judge, discussing at length and with great learning the question of public policy, but declining to pass upon it. [Hyer v. Richmond Traction Co., 80 Fed. 839.] Upon *certiorari* to the Supreme Court of the United States the judgment of the Circuit Court of Appeals was sustained in the opinion from which we have quoted. Five of the Justices concurred in the opinion, HARLAN, J., also concurred on the ground that the contract alleged in the bill was against public policy, while BROWN and PECKHAM, JJ., dissented on the ground that the contract was enforcible in equity as well as at law.

This entire question was thoroughly discussed in the opinions to which we have referred and it is only necessary for us to say that they thoroughly demonstrated the principle that the contract in question here is enforcible at law. In our opinion there is nothing in the opinion of Judge HARLAN inconsistent with this conclusion. In that case two full-fledged corporations had applications pending before the city council for permission to construct the road in a street of Richmond. They agreed, in effect, that to whichever the franchise should be granted they should share equally in the result. Judge HARLAN thought that this arrangement carried deception on its face. In this case there was no corporation or other agency capable of holding the franchise, in existence when the arrangement was made. There is no deception in the situation. The judges were fully informed of the arrangement, and, as the evidence shows, suggested it after investigation, and the corporation was organized in accordance with that suggestion. If it concealed any ulterior and unlawful element upon which the plaintiff acted it should have been pleaded in the answer. [Kelerher v. Henderson, 203 Mo. 498; Musser v. Adler, 86 Mo. 1. c. 449.]

We hold that these parties and all of them had the right to unite in organizing a corporation for the pur-

pose of constructing this road and incidentally obtain a franchise therefor; that, being organized and incorporated it was possessed of all the powers incident to such corporations under the statutes relating thereto, including the right of the stockholders to distribute the stock by arrangement among themselves; that in doing so they might create a valid trust in the holder as to the whole or any part thereof, and that such trust would be enforcible at law or in equity as the facts might indicate.

IV.  The objections of the defendant to the instructions given by the court for the plaintiff, have been practically answered in the second paragraph of this opinion, in which we traced the career of the franchise of the Central Belt Company, which consti-

*Instructions Approved.*  tutes the original trust fund for the conversion of which this suit is prosecuted.  It was the only property of that company, and its capital stock represented it.  Having received the capital stock he held the paper title by means of which he might absolutely dispose of the fund for the benefit of himself and his associates according to their respective interests under the original agreement, and not otherwise.  If he converted it into money or other property the same trust attached itself to the proceeds.  When he caused the St. Louis Belt to be organized he acquired the entire capital stock for himself and associates and caused the franchise which constituted the trust fund to be transferred to it for the benefit of himself and his associates, the trust still clung to the new title under which he held it. When he transferred the new capital stock through the Mississippi Valley Trust Company to the Terminal Association this same franchise was the only property which represented the stock so transferred, because all other property had been acquired by the creation of indebtedness which was assumed and paid with interest by the Terminal Association in addition to the payments for the stock, so that the latter represented the profit arising from the trust fund and nothing else, and for

this he was bound by his contract to account to his associates whom he carried with him by that designation through all his operations with this property. We recapitulate these things in this brief form to indicate without unnecessary repetition the principles evidently in the mind of the court when it gave these two instructions. They conform to this theory and we see no substantial error in their form.

V. Error is predicated on the fact that the court permitted the jury to retire and amend its verdict by computing the interest on the demand, which they did, again coming into court without having stated, except as an inference from the figures, the date from which it had been computed. No objection was made or exception saved at the time but the circumstance was fully detailed in the motion for a new trial. If this action was error the court should have been given an opportunity to avoid or correct it at the time. It was practically a matter of exception, and the objection came too late.

*Amending Verdict.*

We think the judgment should be, and it is, affirmed. *Ragland* and *Small, CC.,* concur.

PER CURIAM:—In the foregoing opinion of BROWN, C,. *Graves, D. E. Blair, Elder* and *Higbee, J. J.,* concur; *J. T. Blair, J.,* concurs in result; *Walker, C. J.,* and *Woodson, J.,* dissent.